UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY CAMDEN VICINAGE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DEBBIE FLO, INC.  Civil Action
  **1:13-cv02650-RBK-JS**

  Plaintiff,

  v.

KEVIN SHUMAN

  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

KEVIN SHUMAN  Civil Action
  Plaintiff  **1:14-cv-00251-RBK-JS**

  -V-

LAUREN KIM, INC., ROY OSMUNDSEN,
GARY OSMUNDSEN and JOHN DOES 1-10,
the DOE CORPORATIONS, *in personam* and
the FV MISS LAURA LOUISE official No.
616723 her engines, tackle and
appurtenances including Federal Fishing
Permit No. 320501 *in rem*

**AMENDED COUNTERCLAIM**

Defendant, Kevin Shuman ("Shuman") pursuant to Fed. R. Civ. R. 13, presents his counter claim against Plaintiff, Debbie Flo, Inc. ("Debbie Flo").

1. Jurisdiction arises under 28 U.S.C §1331 Federal Question pursuant to the Jones Act, 46 U.S.C § 30104, and 28 U.S.C. §1333 General Maritime and Admiralty jurisdiction.

2. At all times relevant hereto Shuman was employed as a seaman aboard the FV MISS LAURA LOUISE.

3. MISS LAURA LOUISE is a wooden fishing vessel 73.7' in length 20.5' feet in breath with tonnages of 85 gross and 58 net, official number 616723 her appurtenances include a Northeast Federal Fishing Permit No. 320501 .

4. At all times relevant hereto MISS LAURA LOUISE was owned by Lauren Kim, Inc. ("Lauren Kim").

5. At all times relevant hereto Debbie Flo was the owner *pro hac vice* of the MISS LAURA LOUISE.

6. At all times relevant hereto Debbie Flo along with Lauren Kim and others managed, operated and controlled the MISS LAURA LOUISE.

7. At all times relevant hereto Debbie Flo along with Lauren Kim and others hired the crew of the MISS LAURA LOUISE.

8. At all times relevant hereto Debbie Flo along with Lauren Kim and others hired Shuman as a seaman and member of the crew of the MISS LAURA LOUISE.

**FIRST CAUSE OF ACTION JONES ACT NEGLIGENCE AND UNSEAWORTHINESS**

9. Sometime between the late night of October 7 and early morning of October 8, 2011 Shuman was working on deck preparing to set the dredge and chain bag overboard to tow for scallops. He went to grab a pear link at an end of a chain with a gaff. The vessel's practice was to wrap the lanyard of the gaff around your arm so that it would not accidently fall into the water; it was the only gaff aboard the vessel. The gaff got caught in the chain links of the chain bag, and before Shuman could free the gaff, the captain, without looking, lowered the dredge. Since the captain did not have the boom, that lowers the dredge, correctly spotted and because of other defects in the design of the vessel, the dredge's chain bag landed in a position that it started

spilling overboard violently pulling the gaff the was caught in the chain and Shuman's right arm yanking his body to the right.

10. Debbie Flo was negligent in not having the proper type of gaff or boat hook that would not get caught in the links of the chain bag, requiring that the deckhands wrap a lanyard around their arms when attempting to retrieve the pear link, the captain being inattentive, talking to the other deckhand and not looking to see that the gaff was caught, not having a system of communication to get the "all clear" from the deckhand on the stern prior to lowering the dredge, failing to properly spot the boom so that the bag would not run overboard, operating a vessel that was negligently designed as to allow the chain bag to spill off the vessel into the water, failure to ascertain that Shuman would not be in danger when he lowered the dredge, lowering the dredge when it was apparent that the gaff was caught in the chain bag, lowering the dredge in a manner that the chain bag would spill overboard and yank Shuman's arm

11. The conditions, acts and omissions outlined in paragraphs 9 and 10 rendered the MISS LAURA LOUISE unseaworthy.

12. The design and construction of the MISS LAURA LOUISE rendered the vessel unseaworthy in that it required the pear link be manually lifted with a gaff or boathook which could snag in the chain bag and that when the chain bag was lowered it could spill overboard running into the water and dragging the seaman on deck with it.

13. The vessel's captain smoked marijuana daily during the voyages; this constituted negligence, rendered him unfit as a master and the MISS LAURA LOUISE unseaworthy.

14. As a result of Debbie Flo's negligence and the unseaworthiness of the MISS

LAURA LOUISE Shuman was caused to sustain a tearing of a prior hernia repair, injuries to his right shoulder, aggravation, exacerbation, and acceleration of prior non disabling asymptomatic conditions of the shoulder causing them to become symptomatic and disabling. Shuman had to undergo surgery to repair his hernia, multiple surgeries to his shoulder including a complete shoulder replacement.  As a result Shuman developed lymphedema.

15. As a result of Debbie Flo's negligence and the unseaworthiness of the MISS LAURA LOUISE  Shuman  has become disabled has incurred medical expenses, loss of earnings, loss of earning capacity, pain and suffering and will incur future medical expenses pain and suffering in an amount to be proven at trial.

## SECOND CAUSE OF ACTION FOR MAINTENANCE AND CURE

16. Shuman asserts and re-alleges the allegations contained in paragraphs 1to 15.

17. Shuman's injuries manifested while in the service of the MISS LAURA LOUISE, therefore Shuman is entitled to maintenance and cure until he reaches maximum medical improvement.

18. Shuman has not reached maximum medical improvement and is entitled to maintenance and cure.

19. Any attempt by Debbie Flo to terminate maintenance and cure prior to Shuman reaching maximum medical improvement would be willful and callous subjecting Debbie Flo to consequential damages, punitive damages and attorney's fees for failing to pay maintenance and cure.

20. Shuman seeks all outstanding maintenance and cure owing up to the date of trial, consequential and punitive damages for failure to pay maintenance and cure.

### THIRD CAUSE OF ACTION FOR PUNITIVE DAMAGES

21. Shuman asserts and re-alleges the allegations contained in paragraphs 1 to 20.

22. The maritime industry and particularly the fishing industry is one of the most, if not the most, dangerous industries in the United States.

23. A ship's captain smoking marijuana on a regular and daily basis during a fishing voyage is wanton and reckless behavior that is causally related to his inattentiveness to his duties which resulted in Shuman's injuries.

24. Debbie Flo was aware its captain was smoking marijuana during the voyages and turned a blind eye to it, which is reckless and wanton behavior.

25. As result of Debbie Flo's and its captain's reckless and wanton behavior Shuman suffered serious and debilitating injuries, warranting punitive damages in an amount to be determined by the jury.

### FOURTH CAUSE OF ACTION PIERCING OF THE CORPORATE VEIL

26. Shuman asserts and re-alleges the allegations contained in paragraphs 1 to 25.

27. Lauren Kim is a domestic corporation whose president, sole shareholder, and sole officer is Gary Osmundsen.

28. Lauren Kim's principal place of business is 12 Rabbit Run, Cape May, NJ 08204, which is the same address as Gary Osmundsen's residence.

29. Debbie Flo, Inc. ("Debbie Flo") is a domestic corporation whose, president, sole shareholder, and sole officer is Roy Osmundsen.

30. Debbie Flo's principal place of business is 14 Whippoorwill Lane, Cape May Court House, NJ 08210, which is the same address as Roy Osmundsen's residence.

31.     Debbie Flo filed suit against Shuman alleging it was his Jones Act employer and sought declaratory judgment to terminate its obligation to pay Shuman maintenance and cure; Debbie Flo, Inc. v Kevin Shuman 1:13-cv-02650 RBK-JS.  Shuman files this compulsory counterclaim suit seeking damages for his injuries, under the Jones Act, doctrine of unseaworthiness and for maintenance and cure.

32.     Shuman filed a separate suit against Lauren Kim, Inc., Gary Osmundsen, Roy Osmundsen, several John Does and the F/V LAURA LOUISE *in rem* 1:14-cv-00251-RBK-JS alleging the same operative facts, as this caee.  Shuman has alleged in that suit that the Court should pierce Debbie Flo's corporate veil and hold the *in personam* defendants liable for Debbie Flo's liability as alter egos.  That action had been consolidated with this action for purposes of management and discovery.  Shuman has filed a motion to have both actions consolidated for all purposes, which is currently pending before this Honorable Court.

33.     F/V MISS LAURA LOUISE and her federal fishing licenses are owned by Lauren Kim.

34.     Fishing is the second most dangerous occupation, with the highest fatality rate according to United States Department of Labor statistics.

35.     Unlike logging, fishermen are not covered by workers compensation but are only entitled to maintenance and cure and the remedies of the Jones Act, 46 U.S.C. §30104 and the doctrine of unseaworthiness to provide medical treatment and compensation for work related injuries.

36.     Gary Osmundsen and Roy Osmundsen operated the FV MISS LAURA LOUISE, hired her crew oversaw her provisioning, maintenance and repair and divided all the profits from

operating the F/V MISS LAURA LOUISE.

37. To avoid having to obtain costly, but sufficient insurance, or have sufficient capital to cover their obligations to pay maintenance and cure, Jones Act or unseaworthiness damages to injured crew, and other debts incurred by the F/V MISS LAURA LOUISE, Gary and Roy Osmundsen attempted to operate the F/V MISS LAURA LOUISE, through a shell company, Debbie Flo, Inc., that was always grossly undercapitalized and which had no assets, office or employees[1].

38. Debbie Flo had no legitimate purpose other than to unjustifiably avoid paying and protecting their assets including the F/V MISS LAURA LOUISE from legitimate claims of injured seaman and other debtors and was merely an instrumentality of Gary and Roy Osmundsen and a façade.

39. Debbie Flo was completely controlled by Gary and Roy Osmundsen and had no free will or mind of its own.

40. Debbie Flo was grossly undercapitalized and could not pay its obligations.

41. Debbie Flo failed to observe corporate formalities: it had no shareholder meetings, maintained no corporate financial records other than checkbook, had no officers or directors other than Roy Osmundsen, it did not pay any dividends, and comingled funds with the Lauren Kim, Inc, Roy Osmundsen, Gary Osmundsen . It did not have any employees.

42. Based on tax records available to plaintiff, 2010, 2010, 2012 and 2013 Debbie Flo did not show a profit, only losses.

43. Debbie Flo's revenues and taxable income are:

---

[1] The seamen hired on the F/V MISS LAURA LOUISE were designated as independent contractors.

| Year | Revenue | Taxable Income |
|------|---------|----------------|
| 2010 | $197,584 | $0 |
| 2011 | $341,210 | -$13,749 |
| 2012 | $397,887 | -$20,767 |
| 2013 | $0 | -$27,692 |

44. The moneys earned by Debbie Flo were siphoned off by Roy Osmundsen and Gary Osmundsen for their own personal use or for payment for expenses unrelated to the operation or obligations of Debbie Flo or the F/V MISS LAURA LOUISE, in order to avoid having to pay Shuman his maintenance and cure and any claims for personal injuries he sustained. No cash on hand was reported by Debbie Flo at the end of 2013.

45. In 2010 Debbie Flo had no taxable income from revenues of $197,584. In 2011 the year of Shuman's injury revenues increase by 73%, yet taxable income went from break even to a loss of $13,479. In 2012 the revenues increased by 16% but taxable income went down to a loss of $20,767. This was due to siphoning off of funds by Gary and Roy Osmundsen.

46. On February 21, 2013 Debbie Flo's insurer advised them that whatever insurance they had had been depleted paying for Mr. Shuman's maintenance and cure and that Debbie Flo would have to pick up payments of the outstanding $87,668 of medical bills and pay future maintenance and cure, and would have to pay any attorney's fees and judgment obtained by Shuman for his injuries. That year Debbie Flo showed no revenues, but incurred expenses as to have a taxable loss of $27,692, and depleted all its cash and tangible assets to zero, for the unjust purpose of avoiding its legal obligation to pay maintenance and cure and damages to Shuman for his injuries.

47. Debbie Flo was totally dominated and controlled by Gary and Roy Osmundsen, had no independent will nor mind of its own, it was a mere instrumentality and alter ego of the

defendants.

48.     Debbie Flo had no assets or capital other than the fish it caught and immediately sold, was insolvent and could not pay Shuman's cure.  It owes over $90,000 in cure (medical expenses) for Shuman's treatment, and has not authorized needed medical treatment and diagnostic tests such as CT scans. Debbie Flo was grossly undercapitalized.

49.     Lauren Kim as the titled owner of the F/V MISSS LAURA LOUISE would be liable for any unseaworthiness and maintenance and cure claims by crewmembers injured on the F/V MISS LAURA LOUISE, unless the vessel was bareboat chartered to another party.

50.      Further evidencing that Debbie Flo was used as a façade by Roy Osmundsen, Gary Osmendsen and Lauren Kim to unjustly avoid paying their obligations to injured crewman and other debtors, is the sham bareboat charter agreement between the Debbie Flo and Lauren Kim, attached as Exhibit 1.

51.     Under a bareboat charter the vessel owner  charters the vessel to the charterer for a set charter hire and period; the charterer  mans, operates, maintains and repairs the vessel during the charter period; acting as the owner *pro hac vice* of the vessel.

52.     Purportedly, on December 9, 2008 Lauren Kim, as the titled owner of the F/V MISS LAURA LOUISE, bareboat chartered the vessel to Debbie Flo which was supposed to operate maintain and repair the vessel.  The bareboat charter does not state the two most basic terms of a charter (or any contract), the charter hire (consideration) and the length of the charter (term of contract), it is merely a sham by Gary Osmundsen, Roy Osmundsen and Lauren Kim, Inc. to use Debbie Flo as an instrumentally to unjustly avoid their legal obligations to Shuman.

53.     The bareboat charter is dated December 9, 2008 and is signed on behalf of Lauren

Kim by its president, Gary Osmundsen, and by Debbie Flo by its president Roy Osmundsen. The bareboat charter was actually signed in the late winter or early spring of 2013, subsequent to Shuman's accident and at the time that Gary Osmundsen and Roy Osmundsen became aware that they would have to fund Shuman's claim themselves. The bareboat charter was signed in 2013 a year which the vessel had no revenue and was not operating.

54. The bareboat charter was backdated to December 9, 2008, (a date prior to Shuman's accident which would, if effective, insulate all parties except the insolvent Debbie Flo from any claim for cure and unseaworthiness) and signed in 2013 which was a misuse of the law and to perpetuate a fraud to avoid defendants' obligations.

55. Debbie Flo never paid charter hire to Lauren Kim for the use of the F/V MISS LAURA LOUISE.

56. Even though the bareboat charter stated that Debbie Flo was responsible for the maintenance and repair of the F/V MISS LAURA LOUISE, Gary Osmundsen, who was neither an officer, employee or contractor of Debbie Flo oversaw the maintenance, repair and operation of the F/V MISS LAURA LOUISE. This is further evidence that Debbie Flo was completely controlled by Roy and Gary Osmundsen and had no free will of its own.

57. Roy Osmundsen received no salary or dividends for his work as president of Debbie Flo.

58. Gary Osmundsen received no salary or dividends for his overseeing the maintenance, repairs and operations of the F/V MISS LAURA LOUISE.

59. The dealings between the Gary Osmundsen, Roy Osmundsen, Lauren Kim, Inc, and Debbie Flo were not arm length transactions.

60. The back dating of the charter party, the failure to have a term to the charter, not paying charter hire, failure to maintain corporate records, not paying dividends, salaries, nor showing any profits, the total control of the corporations by Gary and Roy Osmundsen their siphoning off funds, having Debbie Flo pay expenses not related to her operations, while failing to pay over $90,000 of cure owed for Shuman's medical treatment, draining Debbie Flo of any assets that would allow Shuman to collect for his career ending injuries under the Jones Act, and doctrine of unseaworthiness and maintenance and cure, was a fraudulent, improper, illegal and unjust use of incorporation by Debbie Flo, Roy Osmundsen, Gary Osmendsen and Lauren Kim to prevent Shuman from obtaining his legal right to maintenance and cure and damages under the Jones Act and doctrine of unseaworthiness.

61. That plaintiff contends that the Court should pierce the corporate veil of Debbie Flo. Inc. and find that Roy Osmundsen, Gary Osmundsen and Lauren Kim are legally responsible for the obligations of Debbie Flo and are liable to Shuman for maintenance and cure, and claims under the Jones Act and doctrine of unseaworthiness.

## JURY DEMAND

Shuman demands trial by jury on all causes of action pursuant to <u>Fitzgerald v United States Lines Co.</u> 374 U.S. 16 (1963).

**WHEREFORE** Shuman prays that judgment be entered in his favor against the Debbie Flo on the first and second count in an amount to be proved at trial, consequential damages and putative damages and attorney's fees on the second count, punitive damages on the third count, along with fees, costs, pre and post judgment interest.

TABAK MELLUSI & SHISHA LLP
Counsel for Defendant

By /s/ Jacob Shisha
_____
Jacob Shisha
Counsel For Defendant Kevin Shuman
29 Broadway
New York, NY 10006-3267
Tel (212) 962-1590
Fax (212) 385-0920

# Exhibit 1

# BAREBOAT CHARTER

This Bareboat Charter Agreement entered into on this 9th day of December, 2008, by and between **LAUREN KIM, INC.**, (hereinafter "Owner") and **DEBBIE FLO, INC.** (hereinafter "Charterer").

1. ## BAREBOAT CHARTER

   Owner does hereby charter, bareboat, and unmanned (hereinafter referred to as the "Charter"), and Charterer does hereby agree to hire, bareboat, and unmanned, the F/V MISS LAURA LOUISE, O.N. 616723 (hereinafter referred to as the "Vessel").

2. ## DELIVERY

   The Vessel is being delivered to Charterer in an "as is" condition and Owner makes no representation, or warranty, express or implied, as to the condition or seaworthiness of the Vessel at the time of delivery. Charterer shall not be entitled to make or assert any claim, directly or indirectly, against Owner in respect to the Vessel's condition or seaworthiness. Acceptance of the Vessel by Charterer shall constitute conclusive proof of the fitness of the Vessel for Charterer's intended use and Charterer's continued use shall be conclusive proof of its continued seaworthiness. Delivery to and use by Charterer of the Vessel, which may include any actions taken by Charterer under any provision of this Charter, establishes conclusively that all of the terms and conditions of this Charter are in effect. Owner, however, excepts from said delivery, each and every right, title and interest of Owner in any fisheries permit, fisheries license and each and every quota associated therewith, whether owned or leased, at the time of execution of this Charter, as well as any after acquired fisheries permit, license or quota thereafter provided to the Vessel, whether owned or leased by Owner.

3. ## RESPONSIBILITY

   Charterer assumes full responsibility for the Vessel, its use and operation during the charter period and shall have full and exclusive use, possession and control of the Vessel and shall pay all costs, charges and expenses of whatsoever nature, incident to the use, operation and maintenance of the Vessel during the charter period. Owner assumes no liability for loss of time or damage or expense on account of accidents, strikes, delays, Vessel's damages or breakdowns, etc., or consequential damages and will make no allowance for loss of time due to weather or surface conditions, suspension of work or any other reason. Charterer shall provide a safe berth, including protection from mischief or vandalism for the Vessel. In the event of a casualty, the Owner shall be notified of said casualty in writing within 24 hours. The Vessel shall be operated so that it shall not be overloaded or operated in any manner inconsistent with prudent maritime practices.

5. ## REDELIVERY

   The Vessel shall be redelivered to Owner, unless otherwise lost or declared a constructive total loss, at the expiration of the Charter Term. The Vessel shall be redelivered by Charterer in

DFI00014

as good condition as when delivered, clean and broom-swept, ordinary wear and tear excepted, all at the Charterer's expense. If at the time of scheduled redelivery, the Vessel is damaged or otherwise in need of repair or other work to restore her to condition upon delivery, ordinary wear and tear excepted, charter hire shall remain payable during such repairs and other work, and the Vessel shall not be considered redelivered until she has been restored to said condition upon delivery, ordinary wear and tear excepted.

6.  USE

The Vessel may be used by Charterer for fishing Owner's permits, licenses and quota, whether owned or leased by Owner, and any other lawful purpose agreed to in writing between the parties.

7.  TERM

The Charter term will begin upon delivery of the Vessel continue until Charterer redelivers the Vessel to the Owner in the same good order and condition as when it was received.

8.  CONSIDERATION

In consideration of Owner's agreement to charter the Vessel, Charterer agrees as follows:

a.  Charterer shall make its best effort to fish the permits, licenses and quota of Owner as owner may provide to the Vessel whether owned or leased by Owner.

b.  All right title and interest in the fishing history generated by Charterer's permitted use of the Vessel shall inure to the sole benefit of Owner.

9.  PAYMENT UNTIL RE-DELIVERY

Payment of Consideration, as aforesaid, shall continue, without termination or suspension for any cause, until the day and hour the Vessel is re-delivered to Owner, except that in the event of total loss, actual or constructive, as constructive total loss is defined in the applicable policy of marine hull insurance, payment shall be made up to and including the date and hour of the accident or occurrence giving rise to the loss.

10. VESSEL MODIFICATION

Charterer may make additions and changes to the Vessel without the written consent of the Owner. All equipment installed by Charterer shall remain its property and will be removed at termination of charter thereby returning Vessel to its pre-charter condition unless otherwise agreed to by Owner.

11. CHARGES AND EXPENSES

DFI00015

Charterer shall bear and pay during the term of this Charter all wharfage, loading and unloading charges, and all expenses of any kind whatsoever in connection with the maintenance (clean up) handling, use and operation of the Vessel, at Charterer's sole expense, and shall pay any and all fines or penalties levied against the Vessel by any governmental authority as the result of Charterer's actions or inaction, other than those resulting from acts or omissions of Owner in any capacity, it being understood that during the term of this Charter, Owner retains no control, possession or command of the Vessel.

12. <u>MAINTENANCE AND REPAIR</u>

Charterer shall, without expense to Owner, be fully responsible for maintenance and repair of the Vessel and shall at all times use due diligence to maintain and preserve the Vessel in the same good order and condition as when delivered to Charterer, ordinary wear and tear excepted, so that the Vessel shall be tight, staunch, strong, equipped and in every respect seaworthy. The Vessel shall remain on charter until all maintenance and repairs have been performed.

13. <u>TAXES</u>

Charterer shall pay all taxes applicable to Charterer's control, use and operation of the Vessel, including but not limited to, any transportation, use, sales, or other taxes arising out of the control, use and operation of the Vessel during the term of this Charter (excluding taxes on Owner's income). Charterer agrees to indemnify and hold Owner harmless from all claims, seizures, charges, encumbrances, suits or penalties which may be imposed upon the Vessel or Owner by reason for Charterer's failure to pay said taxes accruing during the term of this Charter.

14. <u>INSURANCE</u>

Charterer shall procure and maintain, at Charterer's cost and expense, during the term of this Charter:

(a) Hull and machinery insurance (American Institute Hull Clauses June 2, 1977, or equivalent), including collision liability coverage, with an agreed value of $100,000.00.

(b) Owner shall have the right to obtain Hull Insurance on behalf of the Charterer should Charterer not obtain same before delivery. Additionally, Owner has the right to pay the premiums for such insurance and to add the premiums to the account of Charterer.

(c) Protection and indemnity insurance, on Form SP-23, including crew claims and third-party claims for bodily injury or death, with limits of $250,000.00 per-occurrence.

15. <u>INDEMNITY</u>

DFI00016

Charterer agrees to defend, indemnify and hold harmless Owner of and from any lien, claim, demand, loss, damage and/or suit arising out of or in any way relating to Charterer's use and/or operation of the Vessel. Charterer shall immediately notify Owner of any such lien, claim, demand, loss, damage and/or suit, and Owner shall have the right, but shall not be obligated, to take over the handling (and/or defense) of such matters. Should Owner take over the handling (and/or defense) of any such matters, all legal fees, costs and other charges incurred shall be solely for Charterer's account and Charterer shall indemnify Owner as set forth above.

If any claim is made against Owner or any of its agents or employees by any employee, contractor, or anyone directly or indirectly employed by Charterer, or anyone for whose acts Charterer or any contractor or sub- contractor may be liable, the indemnification and defense obligations of Charterer under this Section shall not be limited in any way by the amount of compensation, insurance or benefits payable by or for Charterer or any contractor or sub-charterer under workmen's compensation laws, including under the U.S. Harbor Workers and Longshoremen's Act, disability benefit laws or other employee benefit laws.

16. <u>CONSEQUENTIAL DAMAGES</u>

Owner shall not be liable to Charterer, whether based on contract, tort (including negligence), strict liability or otherwise, for loss or anticipated profits, cost of money, loss of use or capital or revenue, or for any special, incidental or consequential damages arising at any time or from any cause whatsoever related to this Charter.

17. <u>LIENS</u>

Neither Charterer nor any of its officers, employees or agents, nor the Master or any other officer or member of the crew of the Vessel(s) shall have any rights, power or authority to create, incur, suffer or permit to be placed or imposed upon the Vessel(s) any maritime or other lien, encumbrance or charge whatsoever, (other than towage liens and salvage) or to incur debt, obligation or charge upon the credit of the Vessel(s). In the event, notwithstanding the foregoing, a maritime or other lien, encumbrance or charge (other than towage, crew's wages and salvage), shall be placed upon the Vessel(s), or in the event the Vessel(s) shall be levied against or taken into custody by virtue of any legal proceedings in any court, based upon claim or cause of action, valid or invalid, founded or unfounded, alleged to have arisen during the term of this Charter, Charterer shall within ten (10) days, caused the Vessel(s) to be released and/or the asserted libel, maritime or other lien, encumbrance or charge to be discharged. In the event a maritime or other lien, encumbrance or other charge shall be placed upon the Vessel(s), or in the event the Vessel(s) shall be levied against or taken into custody by virtue of any legal proceedings in any court, based upon a claim or cause of action, valid or invalid, founded or unfounded, alleged to have arisen, prior to this Charter, Owner shall within ten (10) days cause the Vessel(s) to be released and/or the asserted libel, maritime or other lien, encumbrance or charge to be discharged. During any period in which the Vessel(s) is unavailable for use by Charterer as a result of any claim having arisen prior to this Charter the charter hire due shall be terminated until such time as the Vessel(s) becomes available or a substitute Vessel(s) is furnished.

DFI00017

18. CITIZENSHIP.

Owner agrees, represents and warrants that it is and will remain throughout the charter period a Citizen of the United States within the meaning of the Shipping Act 1916, as amended, qualified to engage in the U.S. coastwise trade within the meaning of said Act. Charterer represents and warrants that it is now and throughout the charter period shall continue to be a citizen of the United States within the meaning of the Shipping Act 1916, as amended, qualified to own or operate the Barges in the U.S. coastwise trade and that it will not assign, convey or permit to be passed its right, title and interest in and to this Charter and the Barges to any person not a Citizen of the United States under this Shipping Act 1916, as amended or under whose control the Barges cannot lawfully engage in the coastwise trade of the United States.

19. NOTICE

The address of Owner for sending of notices hereunder shall be Lauren Kim, Inc. 12 Rabbit Run, Erma, New Jersey 08204.

The address of Charterer for the sending of notices hereunder shall be 14 Whippoorwill Lane, Cape May Court House, New Jersey, 08210.

Any notice under this Charter shall be deemed to have been given if sent by registered mail, telex, or facsimile addressed to the recipient at the address hereinabove set forth and deemed to have been received as of date of receipt of registered mail or if by telex or facsimile when receipt is acknowledged by answer back.

20. APPLICABLE LAW

This Charter shall be governed and construed in accordance with the General Maritime Laws of the United States, provided, however, to the extent that such laws are not applicable for any portion of the work, the laws of the State of New Jersey shall apply. The parties agree that jurisdiction and venue shall exclusively be the United States District Court for the District of New Jersey.

21. LIMITATIONS OF LIABILITY

Notwithstanding all other provisions hereof, Owner and Charterer shall have the benefit of all exemptions from any limitations of liability to which an owner of a Vessel(s) is entitled under the laws of the United States, including but not limited to 46 U.S.C.A. § 305 *et. seq.*

22. DEFAULT

The following shall, without limitation, constitute events of default under this charter:

(a)   Failure of the Charterer to pay charter hire on and when the same shall be due, time being the essence in this respect;

DFI00018

(b) Failure of the Charterer to perform each and every covenant contained herein to be done and performed by it;

(c) The occurrence of any event causing the Charterer to be prohibited by governmental or other action from Chartering the Vessel;

(d) The filing of a petition in bankruptcy by or against the Charterer; the entry of any order adjudicating the Charterer bankrupt; the making by Charterer of a general assignment for the benefit of creditors; the appointment of a receiver of any kind, whether in admiralty, bankruptcy, common law or equity proceedings; the filing by Charterer of a petition for reorganization under the Bankruptcy Act, and/or failure of the Charterer to comply with any applicable provisions of State, Federal and/or territorial laws;

(e) Upon the happening of an event of default as hereinabove specified, then and in every such case, Owner may:

   (i) Withdraw Vessel(s) from Charterer's service. Upon such withdrawal, Charterer shall forthwith be deemed divested or all right, title, interest, claim and/or demand whatsoever, in and to the Vessel(s) and this Charter, and such withdrawal shall be a perpetual bar against the Charterer and against all persons who may claim any right under this Charter or against the Vessel(s). Such Withdrawal does not relieve the Charterer of the obligation to pay, including but not limited to, charter hire, damages, repairs, towing, all expenditures necessary to retake or regain possession of the Vessel(s), and for any and all damages sustained by Owner from or by reason of any default or defaults of the Charterer.

   (ii) In the event that the Vessel(s) shall be arrested or detained and shall not be released within ten (10) days, Charterer does hereby empower and authorize Owner, in the name of the Charterer, to apply for and receive possession thereof, or to take possession thereof, and this power of attorney shall be irrevocable and may be exercised not only by Owner, but also by any appointee or appointees of Owner with full power of substitution for the same extent and effect as if such appointee had been named as one of the attorneys above named by express designation.

23. SEVERABILITY

If any one provision or group of provision in this Charter shall be held to be invalid, void or of no affect for any reason whatsoever, such holding shall not be deemed to affect the validity of the remaining provisions in this Charter, which shall subsist in full force and effect.

24. COUNTERPARTS

6

DFI00019

    This Charter may be signed in counterparts, each of which will be deemed an original and all of which taken together shall constitute one and the same instrument. The Parties intend that fax or scanned signatures constitute original signatures and that a faxed or scanned Charter containing the signatures (original, faxed or scanned) of all the Parties is binding on the Parties, as if original.

    IN WITNESS WHEREOF, the parties hereunder have executed and hereby memorialize this Charter as of the day and year first hereinabove written.

LAUREN KIM, INC.

By: _[signature]_

Its: President

DEBBIE FLO, INC.

By: _Roy Osmush_

Its: Pres

7

DFI00020